UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CASE NO.3: 23-cv- 00414

| | |
|---|---|
| HALEEM GILLILAND,<br><br>    Plaintiff,<br><br>v.<br><br>GARRY L. MCFADDEN, individually and in his official capacity as Sheriff of Mecklenburg County; PLATTE RIVER INSURANCE COMPANY, a corporation in its capacity as Surety on the official bond of the Sheriff of Mecklenburg County and KYLE GARRETT HARRIS, individually and in his official capacity as a Detention Officer of Mecklenburg County<br><br>    Defendants | **MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY GARRY MCFADDEN IN HIS OFFICIAL AND INDIVIDUAL CAPACITY, KYLE HARRIS IN HIS OFFICIAL CAPACITY, AND PLATTE RIVER INSURANCE COMPANY; DECLARATIONS OF SEAN PERRIN AND BETTY COULTER IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

## I.   <u>INTRODUCTION</u>

This Complaint was brought by Haleem Gilliland, a former resident of the

Mecklenburg County Detention Center-Central, ("MCDCC") against Mecklenburg

County Sheriff Garry McFadden in his official and individual capacities, former

Mecklenburg County Sheriff's Office ("MCSO") detention Officer Kyle Harris in

his official and individual capacity, and Platte River Insurance Company, Sheriff McFadden's surety. [Document 1-1].[1]

Plaintiff, a biological male who is transitioning to a female, alleges that she was raped by Harris, that Sheriff McFadden is vicariously liable for Harris' rape, and that MCSO policies and procedure were inadequate to prevent her rape. *Id.* The undisputed evidence demonstrates that Sheriff McFadden is not vicariously liable for Harris' rape, that MCSO complied with the Prison Rape Elimination Act ("PREA"), and had numerous policies in place to prevent sexual assault of residents.

## II. FACTS

### A. MCSO IMPLEMENTED PREA STANDARDS AND TRAINED ITS EMPLOYEES ACCORDINGLY

PREA, 34 U.S.C. § 30301 et seq., was enacted by Congress in 2003 "to address the problem of rape in prison by creating a commission to study the issue and to develop national standards for the detection, prevention, and reduction and punishment of prison rape." *Powell v. Temple*, 2022 WL 2306762 at *2 (E.D. Va. 2022). The Commission established by PREA, the National Prison Rape Elimination Commission, 34 U.S.C. § 30306, drafted standards which were ultimately approved by the United States Department of Justice in 2012. *Kempker v. United States of America*, 2021 WL 4973252 at * 7 n. 7 (N.D. W.Va. 2021),

---

[1] Kyle Harris is proceeding pro-se in his individual capacity.

*memorandum and recommendation adopted* 2021 WL 4059458 ; *see also*

https://www.prearesourcecenter.org/about/prison-rape-elimination-act.  While

compliance with PREA standards is not mandatory, *Longoria v. County of Dallas,*

*Texas*, 2017 WL 958605 at * 16 n. 8, (N.D. Tex. 2017) (unpublished), *order*

*vacated on other grounds on reconsideration*, 2018 WL 339311, MCSO follows

and enforces PREA standards. (KJ 17: 15-23).[2]

Every MCSO employee who attends the detention officer certification

course goes through PREA training.  (AL 9: 16-25).[3]  Every MCDCC employee is

trained on PREA, and every employee has to take yearly testing on PREA

standards.  (KJ 7: 17-19; 43: 16-20).   MCDCC employees are required to recertify

their PREA certification yearly by taking a test online.  (AL 10: 12-14).  MCSO

also provides access to a PREA resource center which contains online classes on

PREA compliance.  (AL 10: 9-11).  MCSO's implementation of PREA standards

also includes developing and maintaining policies on transgender residents.  (KJ

41: 7-12).

MCSO  applies PREA standards to every individual in custody at MCDCC,

as soon as an individual is arrested and brought to Arrest Processing.   (KJ 48: 10-

19). When transgender individuals are arrested, they are brought to Arrest

---

[2]     "KJ" refers to the deposition of Karen Jones, followed by reference to page and line numbers, true copies of which are attached as Exhibit 1-1 to the declaration of Sean Perrin, Exhibit 1 to this Brief.
[3]     "AL" refers to the deposition of  Alexis Leonard,  followed by reference to page and line numbers, true copies of which are attached as Exhibit 1-2 to the declaration of Sean Perrin, Exhibit 1 to this Brief.

Processing and an initial assessment is conducted. (KJ 45: 18-21). If a resident reveals that s/he is transgender, s/he is housed in pod 2300, the infirmary. (KJ 45: 23-25). Arrest Processing staff notify MCSO's PREA compliance manager, Officer Vontressa Davis, whenever a transgender resident arrives. (KJ 46: 1-4; 65: 23-25); (AL 27: 16-25). After Officer Davis is notified that a transgender resident has been arrested, a gender review committee is convened that consists of a member of MCSO classification's unit, representatives from Wellpath, MCSO's medical provider, area mental health, and the PREA compliance manager to determine where the resident should be housed. (KJ 46: 5-10); (AL 38: 10-21). This process includes an investigation to determine whether or not there is a decree order that the resident has changed sexes. (KJ 46: 11-15). If there is no decree order, a transgender resident is housed according to the resident's biological sex organs. (KJ 46: 18-19). If it is determined that a transgender resident is at risk of victimization, that information is communicated to the PREA compliance manager. (KJ 49: 12-20).

After a resident is classified and put in a pod, MCSO continues to enforce PREA standards. MCSO policies and PREA standards prohibit all sexual contact between residents. (KJ 17: 24-25; 18: 1-2). There is no consent to any sexual activity in Detention Center Central. (KJ 18: 21-25). Residents can report a sexual assault by filing a grievance, or telling a pod supervisor or any MCSO employee.

(KJ 13: 18-25). Once a sexual assault complaint is filed, it is directed to the PREA compliance manager or one of the PREA investigators. (KJ 14: 12-23). The PREA investigation is conducted by a trained PREA investigator who receives the report, reviews available video, conducts interviews with the involved parties and other witnesses, and makes a determination. (KJ 19: 17-25; 20: 1-10). All residents found to be in violation of PREA standards are disciplined. (KJ 20: 11-13).

In the housing pods, shower areas consist of private shower stalls with their own doors, but the stalls are side-by-side with common walls. (AL 54: 16-22). Transgender residents are offered the opportunity to shower without any other residents present in the shower area, but MCSO does not prohibit transgender residents from showering at the same time other residents are showering. (KJ 41: 21-22).

If there is a concern about the mental health or safety of a transgender resident, the PREA compliance manager convenes an incident review committee comprised of staff from classification, Wellpath, area mental health, and the PREA compliance manager. (KJ 55: 8-17). The committee recommends if the resident needs to be placed in protective housing. (KJ 55: 18-21). MCSO also provides victim advocates for residents who make claims of sexual abuse through a third party partner, Safe Alliance. (AL 24: 10-24). The resident handbook and pod orientations

inform residents about the resources available for them if they report sexual abuse. (AL 25: 10-14).

### B. PLAINTIFF IS INCARCERATED AT MCDCC ON MARCH 4, 2021

Plaintiff was incarcerated on March 4, 2021 at MCDCC. (AL, Exhibit 12, p. 3). Plaintiff was petite, had long hair, and appeared to have breasts. (AL 32: 7-17). Plaintiff was moved from an orientation pod, to a program pod, and then housed in pod 6300. (TJ Exhibit 8, p. 1).[4] On March 19, an MCSO officer conducted a wellness check in pod 6300 and moved Plaintiff to a wet cell (which has a sink and toilet in the cell) at her request. (TJ Exhibit 8, p. 1). Plaintiff contacted mental health on March 22, 2021, and expressed that pod 6300 was "one of the roughest pods here." *Id*. Plaintiff had no safety concerns, however. *Id*.

On March 30, 2021, mental health technicians spoke with Plaintiff about her safety and well-being. (KJ Exhibit 17, p. 1). Plaintiff informed mental health that she was being approached in sexual ways, including being the target of sexually charged language, the giving of gifts, and "territorial ascertains concerning 'whose girl she is." (AL, Exhibit 9, p. 2). As a result of Plaintiff's concerns, a meeting was held on March 31, 2021 with Wellpath medical director Carl Cooper, an MCSO sergeant, mental health staff, and a regional psychiatric provider, as well as Charlene

---

[4]     "TJ" refers to the deposition of Terri Johnson, followed by reference to page and line numbers, true copies of which are attached as Exhibit 1-3 to the declaration of Sean Perrin, Exhibit 1 to this Brief.

Donovan, Wellpath's behavioral health vice president.  *Id*.  A decision was made to place Plaintiff in pod 1700, the male behavioral health unit ("BHU"). *Id*.

### C. <u>PLAINTIFF IS PLACED IN THE MALE BEHAVIORAL HEALTH UNIT ON MARCH 31, 2021</u>

In pod 1700, the male BHU pod, residents have access to more classes and counseling than other pods.  (AL 38: 22-25; 39: 1-6);  (TJ 8: 16-24). The BHU is a "program" pod where substance abuse counselors, recreational counselors, and behavioral health counselors are onsite, and group and individual counseling sessions are conducted. (AL 39: 3-16).

On May 15, 2021, pod supervisor Prince reported that Plaintiff and another resident, Rajai Strickland, were in a single shower stall  at the same time "doing something."  (AL 49: 21-25; 50: 1-3, 22-25; 51: 1-2; 55: 2-4).  PREA investigator Alexis Leonard was asked to conduct a PREA investigation into these allegations. (AL 30: 21-25; 31: 1).   Leonard had received a two day training in Savannah, Georgia to become a PREA investigator, and also completed on-line courses from the PREA resource center.  (AL 10: 5-11).  Leonard  viewed a video of the incident, and  interviewed Plaintiff and Strickland.  (AL 51: 9-19).  According to Leonard, the video appeared to show Strickland crawling under the shower stall into Plaintiff's shower, and Plaintiff and Strickland talking and kissing in the same shower.  (AL 55: 5-16; 62: 4-15).   Leonard asked Plaintiff what happened.  (AL 53: 15-22).   Plaintiff's response to Leonard was "[she was] giddy.  Like oh, you

found out. She basically in the gist of its, she basically was saying she didn't put the complaint in. She didn't let anybody know and how did I find out." (AL 54: 6-12). Plaintiff also told Leonard that Strickland grabbed her leg, and touched her buttocks. (AL 55: 17-25). During the interview, Leonard told Plaintiff that due to the PREA violation, Plaintiff was going to be moved. (AL 78: 11-16). In response, Plaintiff told Leonard that "every pod that she went to, she received notes from residents basically talking about how cute she was and how her body was shaped." (AL 77: 19-25; 78: 1-3). Strickland refused to make any statements to Leonard. (AL 77: 9-12).

Leonard then issued notices of disciplinary action to both Plaintiff and Strickland for violating facility rules. (AL 82: 13-17, 95: 23-25; 96: 1-2; AL Exhibit 5). As a result, Plaintiff and Strickland were separated and placed in single cell confinement pending a disciplinary hearing. (AL 81: 4-7). Plaintiff was placed in pod 5600. (AL 105: 1-3)

### D. PLAINTIFF MOVES TO POD 5600 ON MAY 17, 2021

Pod 5600 differed from the BHU in several respects. In pod 5600, residents are observed four times per hour, as opposed to two times per hour in the BHU. (AL 96: 16-25; 105: 12-16) In pod 5600, two detention officers are present, where there is only one in BHU. (AL 105: 4-7). Residents in single cell confinement come out of their cells one at a time. (KJ 62: 10-12).

8

On the evening of May 20, 2021, detention officer Mario Johnson was working with Kyle Harris in pod 5600. (MJ 9: 16-18; 17: 15-17).[5] Plaintiff was in cell 5 that evening. (MJ 18: 4-5). During the shift, Johnson was mopping the pod floor and when he finished mopping the floor, he went downstairs to use a vending machine. (MJ 23: 13-22). When Johnson returned to pod 5600, he observed Harris walking out of cell 5. (MJ 24: 1-4). Harris informed Johnson that the resident in cell 5 asked for a plunger, and Johnson observed Harris with either a plunger or toilet brush in his hand. (MJ 20: 15-20; 24: 5-7). Later in the shift, Johnson took the food cart out of the pod. (MJ 21: 18-25; 22: 1-2). When Johnson came back to the pod, he saw Harris again coming out of cell 5. (MJ 21: 12-16). Harris told Johnson that the resident in cell 5 needed a mop. (MJ 24: 8-11). During the shift, Johnson was not suspicious that Harris had engaged in sexual contact with Plaintiff. (MJ 25: 8-11).

The next day, PREA investigator Terri Johnson received an email at 3:38 pm. from detention officer John McKoy reporting that Plaintiff wanted to talk to a PREA representative. (TJ 13: 9-23; TJ Exhibit 22, p. 1). Johnson brought Plaintiff to her office, and Plaintiff told her that she was approached by Officer Harris and that Harris brought her additional snacks to her cell which violated MCSO policy. (TJ

---

[5] "MJ" refers to the deposition of Mario Johnson, followed by reference to page and line numbers, true copies of which are attached as Exhibit 1-4 to the declaration of Sean Perrin, Exhibit 1 to this Brief.

19: 8-15).   According to Plaintiff, Harris forced her to perform oral sex and engaged in anal sex with her. (TJ Exhibit 3, pp. 19-20).[6]   Johnson reviewed the video footage and did not find any inconsistencies in Plaintiff's story that Harris went into her cell. (TJ 20: 10-18).

At 5:14 pm, Terri Johnson notified Harris' supervisors that he should not be allowed to work in pod 5600 while Plaintiff was in the pod.  (TJ Exhibit 22, p. 2). Johnson also requested that mental health providers talk with Plaintiff, and sent her to Atrium hospital for medical evaluation.  (TJ Exhibit 22, p. 3). When Mario Johnson got into work on May 21, he notified his sergeant that he had observed Harris in cell 5 the previous day.  (MJ 26: 4-14).

Harris was removed from pod 5600, and Charlotte Mecklenburg Police Department were contacted, and a criminal investigation began that day (May 21, 2021).  (TJ Exhibit 22, p. 4).  MCSO also initiated an internal administrative investigation but that was put on hold to avoid tainting the criminal investigation. (KJ 34: 1-2). When the criminal investigation concluded with Harris' arrest for three counts of second degree forcible sex offense, one count of attempted second degree forcible sex offense, two counts of sexual battery, and one count of engaging in a sexual act with an inmate,  his employment  was terminated. (KJ 34: 3-6) (TJ Exhibit 3, pp. 4-10).

---

[6]      Defendants have only attached the cited portions of Exhibit 3.

On September 26, 2022, Harris pled guilty to two counts of engaging in a sexual act with an inmate and was sentenced to 20-84 months in the North Carolina Department of Correction. Exhibit 2.[7] Plaintiff subsequently brought this Complaint alleging that Defendants were grossly negligent (first claim for relief) and violated her rights under 42 U.S.C. § 1983 (second claim for relief). [Document 1-1].

## III. ARGUMENT

### A. FEDERAL CLAIM UNDER 42 U.S.C. § 1983

#### 1. OFFICIAL CAPACITY CLAIM

Plaintiff has sued Sheriff McFadden and Harris in their official capacities under section 1983. [Document 1-1]. Such claims actually constitute a suit against the entity of which those officials are agents—in this case, MCSO. *See Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3105 (1985). As the claim against Harris in his official capacity is redundant to the claim against Sheriff McFadden, the official capacity claim against Harris should be dismissed. *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) (as official capacity claims "are essentially the same as a claim against the entity," they "should be dismissed as duplicative when the entity is also named as a defendant.").

---

[7]    Exhibit 2 is the Judgment and Commitment in *State of North Carolina v. Kyle Harris*, 21 CRS 217437

Liability only attaches to MCSO if the deprivation of Plaintiff's constitutional rights was caused by an official policy or custom. *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035-2036 (1978); *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir.1999). Plaintiff also must demonstrate that MCSO's policies or customs were the "moving force" behind the violation of her constitutional rights. *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037-38.

A policy or custom under *Monell* may arise in four ways:

(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (*quoting Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999).

In this case, Plaintiff's Complaint alleges that Sheriff McFadden in his official capacity had a "pattern and practice of allowing sexual assault and failing to prevent sexual assault of transgender individuals," and were "required pursuant to [PREA] [to] adopt high standards to prevent, detect, and respond to sexual abuse." [Document 1-1, ¶¶ 49-50]. The Supreme Court has made it abundantly clear that a Plaintiff seeking to impose *Monell* liability bears a heavy burden:

"Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to

> do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee. [citation]."

*Bd. of County Com'rs of Bryan County v. Brown*, 520 U.S. 397, 405, 117 S.Ct. 1382, 1389 (1997). The Fourth Circuit has confirmed that "[t]he substantive requirements for proof of municipal liability are stringent." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994). For the reasons that follow, Plaintiff has failed to meet this heavy burden.

A municipal policy or custom may arise through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003). "Custom and usage may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell v. McDaniel*, 824 F.2d. 1380, 1387 (4th Cir. 1987) (internal citations omitted). Notably, a party cannot point to his own [incident] to demonstrate that the practice is "persistent and widespread." *Lyles v. Prawdzik*, 2016 WL 3418847 at * 5 (D.Md. 2016) (unpublished). There is no evidence in the record to support a known history of "persistent and widespread" constitutional deprivations on the part of MCSO employees from which to infer a policy or custom of MCSO. *Milligan v. City of Newport News*, 743 F.2d 227, 229-30 (4th Cir. 1984); *see Lanford v. Prince*

*George's Cty.*, 199 F.Supp.2d 297, 305 (D. Md. 2002) (finding that the plaintiff failed to provide support for his Monell claim when he pleaded "conclusory factual allegations devoid of any reference to actual events"). In fact, the evidence shows the opposite.

There have been no sexual assaults on transgender residents at MCDCC in the last five years. (KJ 65: 2-6). The lack of any evidence of any similar assaults is fatal to Plaintiff's *Monell* claim. In *Heywood v. Virginia Peninsula Regional Jail Authority*, 217 F. Supp. 3d 896 (E.D.Va.), an inmate who engaged in sex with a correctional officer sought to hold the Virginia Peninsula Regional Jail responsible under a *Monell* theory for the assault. *Id*. at 902-903. The inmate produced evidence of four substantiated incidents (over eight years) of male employees committing sexual acts with inmates in a medical ward, but the district court found that this evidence did not create a "custom or usage" to satisfy *Monell* standards. *Id*. *See also Andrews v. Fowler*, 98 F.3d. 1069, 1076 (8th Cir. 1996) (two instances of sexual misconduct by officer does not amount to a "persistent and widespread" pattern of misconduct under *Monell*.).

There is also no evidence that MCSO was deliberately indifferent with regard to its policies. MCSO voluntary adopted PREA standards. *Does 112 v. Michigan Department of Corrections*, 2018 WL 5786199 at * 8 (E.D. Mich. 2018) (unpublished) (compliance with PREA standards is not mandatory). According to

Major Karen Jones, MCSO's 30b6 witness, "[w]e have the Prison Rape Elimination Act. And we follow those standards, we abide by those standards, and we enforce those standards." (KJ 17: 18-23). MCSO instituted a gender review committee to ensure that transgender residents were properly classified, provided training for PREA investigators, and addressed transgender mental health concerns with an incident review committee consisting of MCSO staff, mental health staff, and Wellpath staff. Kyle Harris' rape of Plaintiff did not happen- as Plaintiff must show-because of MCSO policies, but rather despite MCSO policies.

In addition, Harris had no prior assaultive conduct or in fact, any disciplinary history. (KJ 36: 9-17). When Plaintiff reported her concerns, MCSO immediately removed Harris from Plaintiff's pod, sent a trained PREA investigator to interview her, got her mental health and medical help, and reported the incident to the Charlotte Mecklenburg Police Department. (TJ Exhibit 22, pp. 1-4). *See Cain v. Rock*, 67 F.Supp.2d. 544, 550 (D. Md. 1999) (no deliberate indifference with respect to county policies where assailant had no history of assaults, and when alerted, the county moved quickly to investigate allegations). In fact, MCSO would often assist transgender inmates and provide "certain things to transgender inmates. If they need specific things, like bras or, you know, if they had needs like that, they would call and ask." (TJ 6: 16-21) Terri Johnson, for instance, would tell Plaintiff to "not sit around in just your bra because guys are walking around and you're getting

unwanted attention. So just trying to tell her things that I thought would keep her safe and would not bring attention to her." (TJ 7: 11-16). This evidence demonstrates that MCSO policies and procedures were in place to prevent transgender residents from being assaulted, and to ensure that they remained safe.

As Plaintiff has failed to identify any municipal policy or custom that caused her injuries, her official capacity claim against Sheriff McFadden is barred. *Board of Commissioners of Bryan County v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 1388 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-81, 106 S.Ct. 1292, 1298-1299 (1986).

## 2. INDIVIDUAL CAPACITY CLAIM

Without any facts to support her claim, Plaintiff alleges that Sheriff McFadden "acted with reckless disregard and deliberate indifference to rights of Plaintiff." [Document 1-1, ¶ 52]. Under the new deliberate indifference standard established by the Fourth Circuit in *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023), Plaintiff must prove that Sheriff McFadden "intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk," and "knew or should have known (a) that [Plaintiff was at risk of harm] and (b) that [his] action or inaction posed an unjustifiably high risk of harm."

Several reasons compel the dismissal of this individual capacity claim. In order to establish individual capacity liability under § 1983, Plaintiff must show that

16

Sheriff McFadden "acted personally in the deprivation of [her] rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (internal citations omitted); *Garraghty v. Commonwealth of Virginia, Department of Corrections*, 52 F.3d 1274, 1280 (4th Cir. 1995).

There must be some evidence of wrongdoing or involvement against Sheriff McFadden to assert an individual capacity claim against him. *Wilcox v. Brown*, 877 F.3d. 161, 170 (4th Cir. 2017). The only factual allegations against Sheriff McFadden are that he is the elected Sheriff, and he maintained a bond. [Document 1-1, ¶¶ 4, 7]. There are no allegations that he was involved in any decisions to move Plaintiff, supervised her, or allowed Kyle Harris to rape her. As a result, the individual capacity section 1983 claims against Sheriff McFadden should be dismissed. *Fisher v. Washington Metro. Transit Auth.*, 690 F.2d 1133, 1142 (4th Cir. 1982) (upholding dismissal of claim against county sheriff where there was "no evidence that [sheriff] participated directly in any of the events of [plaintiff's] detention"). "); *McDonald v. Dunning*, 760 F.Supp. 1156, 1169 (E.D.VA. 1991) ("[b]ecause plaintiff has presented no evidence of the sheriff's personal involvement in the alleged violations, and the sheriff has averred that he had no knowledge of plaintiff's incarceration, the suit may not proceed against the defendant sheriff in his individual capacity.")

Even if Sheriff McFadden was personally involved in this case, the record is clear that MCSO reasonably addressed the risk to Plaintiff. On March 19, an MCSO employee conducted a wellness check on Plaintiff and moved her to a wet cell at her request. Three days later, mental health officials assessed Plaintiff and she expressed no safety concerns. After Plaintiff expressed concern that she was being approached in sexual ways, MCSO convened a meeting with mental health, medical, and moved Plaintiff to BHU. Even after she was removed from BHU for violating MCSO rules, she was placed in single cell confinement, which was one of the safer places where Plaintiff could be housed. According to Karen Jones: "[s]ingle cell confinement is safer [than other pods] because in single cell confinement only one individual is allowed to come out of their cell at a time. So it's less risk for that individual to interact with any other resident in that pod." (KJ 62: 10-15).

Sheriff McFadden is also protected by qualified immunity since he did not violate Plaintiff's clearly established rights. *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991). Qualified immunity shields "government officials performing discretionary functions…from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). If there has been no violation of a Plaintiff's constitutional rights, a defendant is entitled to qualified immunity without any

consideration of whether the right violated was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001).[8] As Sheriff McFadden committed no constitutional violation, he is entitled to qualified immunity.

## B. <u>STATE CLAIM: GROSS NEGLIGENCE</u>

The gross negligence against Sheriff McFadden and Kyle Harris in their official capacities and against Sheriff McFadden in his individual capacity should be dismissed for several reasons.

### 1. <u>OFFICIAL CAPACITY CLAIMS</u>

#### a. <u>THE CLAIM AGAINST HARRIS IS DUPLICATIVE</u>

The official capacity claim against Harris is duplicative to the official capacity claim against Sheriff McFadden, and should be dismissed on this ground. *May v. City of Durham*, 136 N.C.App. 578, 584, 525 S.E.2d 223, 229 (2000)("in a suit where the plaintiff asserts a claim against a government entity, [also naming] those individuals working in their official capacity for th[e] government entity is redundant."); *Oakwood Acceptance Corp. v. Massengill*, 162 N.C.App. 199, 211–12, 590 S.E.2d 412, 422 (2004) (holding that claims against county tax collector were "identical" to clams asserted against county and thus trial court properly dismissed claims against tax collector on summary judgment).

---

[8] Defendants are not arguing that Plaintiff's right to be free of being raped as a pre-trial detainee was not clearly established.

### b. SHERIFF MCFADDEN CANNOT BE LIABLE UNDER RESPONDEAT SUPERIOR THEORY

In her gross negligence claim, Plaintiff seeks to hold Sheriff McFadden liable under respondeat superior and vicarious liability. [Document 1-1, ¶ 44]. It is well established law that where the doctrine of respondeat superior is relied upon as a basis for recovery by a third person, the tortious act of the servant must be committed in the scope of his employment. *Van Landingham v. Sewing Machine Co*., 207 N.C. 355, 357, 177 S.E. 126, 127 (1934); *see also Estes v. Comstock Homebuilding Cos*., 195 N.C.App. 536, 540, 673 S.E.2d 399, 402 (2009) ("[T]he master is not responsible if the [conduct] of the servant which caused the injury occurred while the servant was engaged in some private matter of his own or outside the legitimate scope of his employment." (quotation omitted)). However, if the act is carried out "to gratify his personal animosity or to carry out an independent purpose of his own, then the master is not liable." *Robinson v. McAlhaney*, 214 N.C. 180, 183, 198 S.E. 647, 650 (1938) (citations omitted). In this case, Harris' rape of Plaintiff does not invoke respondeat superior liability.

In *Johnson v. Causey*, 207 N.C. App. 748, 701 S.E.2d. 404 (2010) (unpublished), the North Carolina Court of Appeals addressed a virtually identical issue. Gattison, a New Hanover county detention officer, rubbed an inmate's breasts, and engaged in vaginal intercourse with her. *Id*. at * 1. In rejecting

Plaintiff's claim that the elected Sheriff was liable for Gattison's conduct under the doctrine of respondeat superior, the Court held that "Gattison was not acting within the scope of his employment when he sexually assaulted plaintiff." *Id*. at * 7. The Court held that "[d]uring each of the alleged sexual assaults on plaintiff, Gattison was not acting in furtherance of the official pursuits of the Sheriff of New Hanover County, but rather was acting to further his own 'personal and reprehensible purposes.'" *Id*. at * 6. *See also Young v. Great American Ins. Co. of N.Y.*, 162 N.C. App. 87, 92, 590 S.E.2d. 4, 8 (2004) (Hunter J. dissenting), *per curiam rev'd based on the dissenting opinion*, 359 N.C. 58, 602, 673 (2004) (in declaratory action case, court holds that "plaintiff was not performing law enforcement duties at the same time as he was sexually assaulting the victims.").

c. **SOVEREIGN IMMUNITY PROTECTS DEFENDANTS**

Additional reasons compel the dismissal of the official capacity claims. Sheriff McFadden and Kyle Harris in his official capacity are entitled to sovereign immunity for the official capacity gross negligence claim. The doctrine of sovereign immunity "shields municipalities and the officers or employees thereof sued in their official capacities from suits based on torts committed while performing a governmental function." [citation] *Houpe v. City of Statesville*, 128 N.C.App. 334, 340-41, 497 S.E.2d 82, 87 (1998). While sovereign immunity is waived by purchase

21

of insurance, sovereign immunity is retained for causes of action excluded by the insurance policy. *See Dickens v. Thorne*, 110 N.C. App. 39, 43, 429 S.E.2d 176, 179 (1993). The operation of the jail is a governmental function for which sovereign immunity applies. *Hare v. Butler*, 99 N.C App. 693, 698, 394 S.E.2d 231, 235 (1990).

As demonstrated by the declaration of Betty Coulter, Sheriff McFadden is entitled to sovereign immunity because the purchased insurance does not provide coverage for the gross negligence claim. (BC Dec. ¶¶ 13-14).[9] MCSO has a 1.5 million dollar self-insured retention. (BC Dec. ¶ 6). This self-insured retention does not waive the Sheriff's Office's entitlement to sovereign immunity. *Kephart v. Pendergraph*, 131 N.C. App. 559, 564, 507 S.E.2d. 915, 918-919 (1998).

If the self-insured retention is exhausted, MCSO is covered by excess policies issued by Safety Specialty Insurance Company in the amount of 2 million dollars, which does not apply until payment of the self-insured retention. (BC Dec. ¶ 7; BC Dec. Exhibits 3-1, 3-2). The general liability coverage excludes law enforcement activities, and the law enforcement coverage specifically contains an exclusion which does not provide coverage. (BC Dec. ¶¶ 9-10; BC Dec. Exhibits 3-1, 3-2). The endorsement to the law enforcement coverage provides that:

---

[9] Coulter's declaration and exhibits to her declaration are attached as Exhibits 3, 3-1, and 3-2. The premiums are redacted in the Exhibits.

"[t]he purchase of this policy is not intended by the Insured to waive its governmental immunity under North Carolina General Statutes Sect. 153A-435…this policy provides coverage only from Wrongful Acts for which the defense of governmental immunity is clearly not applicable or which, after the defense of governmental immunity is asserted, a court of competent jurisdiction determines the defense of governmental immunity is not applicable.

(BC Dec. ¶ 11; BC Dec. 3-2).

In *Patrick v. Wake County Dept. of Human Services*, 188 N.C.App. 592, 596, 655 S.E.2d 920, 923 (2008), the liability insurance policy issued to the Defendants stated: "This policy is not intended by the insured to waive its governmental immunity as allowed by North Carolina General Statutes Sec. 153A-435." As the policy excluded claims to which the County had governmental immunity, the Court of Appeals affirmed the grant of summary judgment to DSS and stated that "[a] governmental entity does not waive sovereign immunity if the action brought against them is excluded from coverage under their insurance policy." *Id*.

After Patrick, virtually identical policies to the ones in this case have been held as sufficient to preserve immunity in numerous cases by state and federal courts. *See, e.g., Estate of Earley v. Haywood County Dep't of Soc. Svcs*., 204 N.C. App. 338, 341-43, 694 S.E.2d 405, 408-09 (2010) (no waiver of immunity where insurance contract excludes coverage for "[a]ny claim, demand, or cause of action against any Covered Person as to which the Covered Person is entitled to sovereign

immunity or governmental immunity under North Carolina Law."); *accord Owen v. Haywood County*, 205 N.C. App. 456, 460, 697 S.E.2d 357, 359 (2010) ; *Cooper v. Brunswick County Sheriff's Dep't*, 896 F. Supp. 2d 432, 453 (E.D.N.C. 2012).

## 2. <u>INDIVIDUAL CAPACITY CLAIM</u>

### a. <u>THERE IS NO NEED TO TRAIN HARRIS  NOT TO RAPE</u>

As set forth earlier, there is no evidence that Sheriff McFadden was involved in any way in this case. As a result, he is entitled to dismissal of the gross negligence individual capacity claim against him.  *Wright v. Town of Zebulon*, 202 N.C.App. 540, 545 n. 1, 688 S.E.2d 786, 790 n. 1 (2010) (dismissing individual capacity claims where Plaintiff failed to forecast any evidence that Defendants were involved in "integrity check.").

While Plaintiff contends that Sheriff McFadden failed to train Harris, [Document 1-1, ¶ 42], Courts have routinely held that there is not an obvious need to train law enforcement employees not to rape arrestees or inmates.  *See  Andrews v. Fowler*, 98 F.3d. 1069, 1077 (8th Cir. 1996) (in section 1983 failure to train case, court states that "[i]n light of the regular law enforcement duties of a police officer, we cannot conclude that there was a patently obvious need for the city to specifically train officers not to rape young women."); *Parrish v. Ball*,  594 F.3d. 993, 999 (8th Cir. 2010) ("[w]e do not believe that there is a patently obvious need to train an

officer not to sexually assault women, especially where there is no notice at all that such behavior is likely. An objectively reasonable officer would know that it is impermissible to touch a detainee's sexual organs by forcible compulsion.").

### b. PUBLIC OFFICIAL IMUNITY PROTECTS THE SHERIFF

Sheriff McFadden is also entitled to public official immunity for this claim. A "public official is immune from personal liability for mere negligence in the performance of his duties, but he is not shielded from liability if his alleged actions were corrupt or malicious or if he acted outside and beyond the scope of his duties." *Slade v. Vernon*, 110 N.C.App. 422, 428, 429 S.E.2d 744, 747 (1993). Stated another way, "[p]ublic officers are absolutely immune from liability for discretionary acts absent a showing of malice or corruption." *Jones v. Kearns*, 120 N.C.App. 301, 305, 462 S.E.2d 245, 247 (1995). There is no evidence that Sheriff McFadden acted maliciously or corruptly in this case.

### C. CLAIM AGAINST PLATTE RIVER

The only allegation in the Complaint relating to Platte River is that it is a surety on Sheriff McFadden's official bond. [Document 1-1, ¶ 6]. There are no allegations that Platte River was otherwise involved in this case. A claim against Platte River, or any other surety, must be brought pursuant to N.C.G.S. § 58-76-5.

Plaintiff failed to bring suit against Platte River under N.C.G.S. § 58-76-5, mandating dismissal of any purported claim against Platte River. *See Frink v. Batten*, 197 N.C. App. 231 at * 7, 676 S.E.2d 670 (Unpublished 2009). Even if Platte River were properly before the Court, Platte River would only be liable if Plaintiff were "injured by the neglect, misconduct, or misbehavior in office" of Sheriff McFadden. N.C.G.S. § 58-76-5. Without any underlying "acts of negligence," however, Platte River cannot be held liable and should be dismissed from this suit. As demonstrated earlier, Plaintiff has not demonstrated any acts of negligence committed by Sheriff McFadden.

IV.     **CONCLUSION**

Sheriff McFadden is entitled to judgment as a matter of law on Plaintiff's Complaint because Plaintiff has failed to present any genuine issue of material fact as to her claims.

This 14th day of March, 2024.

s/ Sean F. Perrin
Sean F. Perrin (NCSB No. 22253)
WOMBLE BOND DICKINSON (US) LLP
301 S. College Street, Suite 3500
Charlotte, North Carolina 28202
Telephone: 704-331-4992
E-mail: Sean.Perrin@wbd-us.com
*Attorney for Defendants*

/s/ Marilyn Porter
N.C. State Bar. No. 8859
Marilyn.porter@mecklenburgcountync.gov
/s/J. George Guise
N.C. State Bar. No. 22090
George.Guise@mecklenburgcountync.gov
Mecklenburg County Sheriff's Office
801 East Fourth St.
Charlotte, NC 28202
Telephone:  704- 336-8100
*Attorneys for Defendant Sheriff Garry*
*McFadden*

CERTIFICATION

Pursuant to Section 3(b)(iv) of the Court's Initial Scheduling Order, and the Case Management Order [Document 15], the undersigned certifies that the foregoing Memorandum of Law, excluding the case caption and certificates of counsel, does not exceed 6,000 words.

/s/Sean F. Perrin

## CERTIFICATE OF SERVICE

     I hereby certify that on this 14th day of March, 2024, a copy of the foregoing was filed via CM/ECF and a copy was sent via U.S. Mail to the following non CM/ECF participant:

Kyle Garrett Harris
Inmate # 1693707
Warren Correctional Institution
Post Office Box 728
Norlina, NC 27563

s/Sean F. Perrin